APPENDIX

1   things, did you have an opportunity to talk to anybody at the
2   Post Office?
3   A.   Well, she -- she had called on my phone and left a
4   message.
5   Q.   The same day?
6   A.   Mm-hmm.
7   Q.   Okay.
8   A.   And the next morning, I called her.
9   Q.   Okay.
10  A.   And she wanted to know what happened. And I explained
11  to her and she said, Well, I'm sending a man over to sign
12  some papers. I said, I don't think so. I said, I would
13  rather have a lawyer with me.
14  Q.   All right.
15  A.   And -- and that was it.
16  Q.   Well, did she talk about anything else?
17  A.   No, she didn't. No.
18  Q.   All right.
19  A.   So that was the end of the conversation.
20  Q.   Did she ever send any -- well, did she, I mean,
21  for example, did she say anything at all about
22  Mr. Maurer?
23  A.   Yes, she did.
24  Q.   What did she say?
25         MS. HANNIGAN:  Objection, your Honor. Hearsay.

A-1

1           I said, What can I do?

2           He says, Get a lawyer.

3  Q.   Okay.

4  A.   That's when I decided. It was about 9:00 o'clock that

5  night.

6  Q.   And one -- the first thing you did about reporting the

7  incident is you went to the Dover Post Office; right?

8  A.   I went back to Magnolia and they were closed.

9  Q.   Okay.

10 A.   We came back from Veterans Hosptial pretty late. They

11 were closed. They close at 3:30 or 4:00 I guess it is, and

12 so I went to Dover.

13 Q.   Okay.

14 A.   Mm-hmm.

15 Q.   And at the Dover Post Office, they told you to report

16 the incident to the Magnolia Post Office; right?

17 A.   Yes.

18 Q.   Okay.

19 A.   And my daughter had already did that.

20 Q.   And when you got home that day, the same day of this

21 incident, you had already had a message from the Postmaster

22 of the Magnolia Post Office; right?

23 A.   Yes. I was on my telephone.

24 Q.   Okay. And then the next day you called her back;

25 right?

A-2

1  A.  Yes, I did.
2  Q.  And you say that she said she was going to
3  send somebody over with some papers for you to sign;
4  right?
5  A.  Mm-hmm.
6  Q.  And you told her, I'm going to get a lawyer; right?
7  A.  That's what I told her.
8  Q.  And then she hung up on you; right?
9  A.  She did.
10 Q.  She was rude; right?
11 A.  No. She wasn't rude. She wasn't really rude. She
12 just said, Okay.
13 Q.  She slammed the phone down, didn't she?
14 A.  No, she didn't. She said, Okay.
15 Q.  And then hung up; right?
16 A.  Hung up. She also said something else, too. He won't
17 let me tell you.
18 Q.  Ma'am, you testified on direct examination that, as a
19 result of your injuries, you are no longer able to do your
20 yard work?
21 A.  No, I can't.
22 Q.  You also testified you can't do your housework?
23 A.  Well, I can do some of it, but I have a lady coming in,
24 doing the hard, the stuff that I can't reach for. My leg
25 won't -- I can't get on a ladder anymore.

1  didn't she?
2          MR. GRADY: I object, your Honor. This is a
3  misrepresentation. The prior testimony offered testimony
4  that there were other conversations being made which defense
5  objected to and which were excluded and I think that it's not
6  a fair representation to the witness that this conversation
7  didn't exist.
8          THE COURT: Well, it seems to me we have had this
9  conversation before.
10         Is there something you want to add to what was
11 already stated?
12         MR. BEAUSANG: If I could, your Honor, I just
13 want to read one more portion from the deposition transcript
14 that addresses this.
15 BY MR. BEAUSANG:
16 Q.    Ma'am, if I could ask you to turn to Page 58 of the
17 transcript. And I'm at line 10 and you're talking to Ms.
18 Hannigan about --
19 A.    I haven't found 58 yet.
20 Q.    I'm sorry.
21 A.    Okay.
22 Q.    I'm at line 10 and you're testifying about Mrs. Ward,
23 the phone conversation you had with Karen Ward.
24         On line 10, Ms. Hannigan asked you, "She told you
25 she was sending somebody over with papers for you to sign,"

A-4

1  and you said, "No, I want to get a lawyer." You answered,
2  "Yes."
3           Ms. Hannigan asked, "Was there anything more to
4  that conversation? Can you tell me anything more about
5  that?"
6           And you answered, "No, she hung up on me."
7           Ms. Hannigan asked, "She hung up on you?"
8           And you answered, "Yes."
9           Ms. Hannigan asked, "What do you mean? Describe
10 that."
11          And you answered, "Well, she just slammed the
12 phone."
13 A.   I told --
14 Q.   Did I read that correctly?
15 A.   I told them that day exactly what she told me on the
16 phone. Left it out of here, but she told me exactly what she
17 said on that phone by him.
18 Q.   Okay.
19 A.   If you want to hear it, I will tell you.
20 Q.   I just -- all -- did I read the deposition correctly?
21 A.   You left some of it out.
22 Q.   Okay. All right.
23           MR. BEAUSANG: That's all, ma'am.
24           No further questions, your Honor.
25           THE COURT: All right. Any redirect?

A-5

1   there, no.

2   Q.   Okay.  December 17, 2002, did you conduct an

3   investigation of this incident?

4   A.   No.  I wasn't informed of the accident until the

5   following day.

6   Q.   Did you call Ms. Greene?

7   A.   After I was contacted by her daughter, Mrs. Ruth Pugh,

8   who faxed me over a statement from Mrs. Greene, then, yes, I

9   did call Mrs. Greene, because there's -- there was

10  information on the accident investigation that I needed from

11  her.

12  Q.   And did you eventually talk to Mrs. Greene?

13  A.   Yes.  She called me back.

14  Q.   Okay.

15  A.   When it was convenient for her.

16  Q.   What did you talk about, if you remember?

17  A.   Well, of course, I expressed my, you know, concern that

18  she had fallen in my parking lot, and that we wanted to

19  conduct a good investigation, a thorough investigation, to

20  make sure that all the information was recorded, and that,

21  you know -- I inquired as to her well-being, whether she had

22  seen a physician, whether she needed us to schedule one with

23  ours.

24  Q.   Okay.  Did you hang up on her?

25  A.   Oh, no.  No.  That's not my style.  I -- I've been told

A-b

1  over his shoulder, so I don't -- yes, he has to, because he
2  has to put that information in. And a return address is
3  required on all parcels.
4  Q.    All right.
5  A.    That's part of the security.
6  Q.    Did you ever get back to Mrs. Pugh about what your
7  findings were?
8  A.    I don't recall, sir.
9  Q.    Did you ever get back to Mrs. Greene about what your
10 findings were?
11 A.    I don't recall.
12 Q.    Did you ever apologize to Mrs. Greene for the conduct
13 of Mr. Maurer?
14 A.    I said I was sorry that she had become upset and hurt
15 herself.
16 Q.    No. Did you ever apologize to Mrs. Greene for the
17 conduct of Mr. Maurer?
18 A.    No.
19 A.    No, not that I recall.
20        MR. GRADY: That's all I have, your Honor.
21        THE COURT: Redirect?
22        MR. BEAUSANG: Thank you, your Honor.
23        May I approach the witness, your Honor?
24        THE COURT: Yes, you may.
25                    REDIRECT EXAMINATION

A-7

1  you recall about the interaction that brings us to court
2  today.
3  A.  Well, Karen told me that she received a complaint on me
4  and asked me to write up a statement of what happened at that
5  time.
6          I wrote up a statement, stating that it was --
7  actually, it was a busy day.  A lady came in, gave me a
8  package that had ORM-D on it.
9          I pointed the package out to the individual and
10 pointed to a poster that has, about the mailability, not
11 accepting of reused boxes, and the individual stated that she
12 was blind.
13         At that time I said, I'm sorry, crossed out the
14 ORM-D on the package to be shipped.
15 Q.  Okay.  So did you engage in the required visual
16 inspection of the package?
17 A.  Yes.
18 Q.  And did you do the shake test of the package?
19 A.  I did pick it up and all that and it was very lopsided
20 and I did shake it, yes.
21 Q.  And did you do anything about the label that you saw,
22 the ORM-D label?
23 A.  Yes.  I crossed the ORM-D label off.
24 Q.  And are you supposed to do that?
25 A.  No, I'm not.  No, I'm not.

A-8

# CLAIM FOR DAMAGE, INJURY, OR DEATH

INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of the form. Use additional sheet(s) if necessary. See reverse side for additional instructions.

FORM APPROVED
OMB NO. 1105-0008
EXPIRES 3-31-91

**1. Submit To Appropriate Federal Agency:**
United States Post Office
8 North Main Street
Magnolia DE  19962

**2. Name, Address of claimant and claimant's personal representative, if any.** (See instructions on reverse.) (Number, street, city, State and Zip Code)
Lucille Greene, 234 Hunters Ridge Way
Magnolia DE  19962
John S. Grady, Esq., 6 N. Bradford St. Dover DE 19904

**3. TYPE OF EMPLOYMENT**
☐ MILITARY  ☒ CIVILIAN

**4. DATE OF BIRTH**
3/01/18

**5. MARITAL STATUS**
Married

**6. DATE AND DAY OF ACCIDENT**
Dec. 17, 2002

**7. TIME (A.M. OR P.M.)**
9:30 a.m.

**8. Basis of Claim** (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof) (Use additional pages if necessary.)

Ms. Greene went to the Post Office to mail a package. The treatment she received from the Post Office employee was so upsetting that when she finally left the Post Office, she was not as careful as she would normally have been and as a result, she tripped over a parking stopper. She injured her left knee, right side of her face, and her tooth. As a result of an operation, her foot is numb and swollen. See attached statement as to the particulars of her treatment.

**Received JUN 2 2 2004 Delivery Programs**

**9. PROPERTY DAMAGE**

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, street, city, State, and Zip Code)
---

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF DAMAGE AND THE LOCATION WHERE PROPERTY MAY BE INSPECTED. (See instructions on reverse side.)

$170 to replace a diamond on her ring.

**10. PERSONAL INJURY/WRONGFUL DEATH**

STATE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE NAME OF INJURED PERSON OR DECEDENT.

Permanent injury to left knee - still swollen, permanent injury left foot - now difficult to walk, right side of face, lost a tooth which was repaired.

**11. WITNESSES**

| NAME | ADDRESS (Number, street, city, State, and Zip Code) |
|---|---|
| Post Office employees Two civilians | 8 North Main Street, Magnolia DE  19962 |

**12.** (See instructions on reverse)   **AMOUNT OF CLAIM** (in dollars)

| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights.) |
|---|---|---|---|
| $170.00 | $250,000 |  | 250,170 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE ACCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM

**13a. SIGNATURE OF CLAIMANT** (See instructions on reverse side.)
*Lucille M Greene*

**13b. Phone number of signatory**
302-335-1266

**14. DATE OF CLAIM**
10/3/03

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant shall forfeit and pay to the United States the sum of $2,000, plus double the amount of damages sustained by the United States. (See 31 U.S.C. 3729.) | Fine of not more than $10,000 or imprisonment for not more than 5 years or both. (See 18 U.S.C. 287, 1001.) |

95-108
Previous editions not usable.

NSN 7540-00-634-4046

STANDARD FORM 95 (Rev. 7-85)
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2

A-9

**Additional Statement of Claim**
**RE: Lucille Greene**

The conduct constituting emotional distress was as follows:

Ms. Greene came to the Post Office with the purpose of mailing out a box which contained two fruit cakes. The Post Office employee in a challenging and insulting way whether or not there were explosives in the box. He continued to degrade Ms. Greene who is 85 years old to the point that she was ultimately in tears. His conduct went beyond discourteous to the point where it was intentionally meant to insult and upset Ms. Greene. There were several witnesses to this incident. Unfortunately, Ms. Greene does not at this time, know their names. The incident should have been reported at the Post Office particularly when it became known that Ms. Greene went outside and subsequently fell on a Post Office parking stopper and injured herself. Ms. Greene is in the process of trying to obtain the names of two witnesses who she remembers helping her.

Federal cases have acknowledged that intentional or negligent infliction of emotional distress claims can be brought under the federal tort claims act. They are <u>Sabow v. U.S.</u>, 93 F.3d 1445 (9th Cir. (Cal.) 1996); <u>Truman v. U.S.</u>, 26 F.3d 592 (1994); <u>Hambleton v. U.S.</u>, 87 F.Supp. 194 Rev'd. on other grounds.

The State of Delaware also recognizes the tort of intentional or negligent infliction of emotional distress. See <u>Thomas v. Harford Mutual Insurance Co.</u>, 2003 WL 220511.

Received
JUN 22 2004
Delivery Programs

A-10

MARY ANNE GIBBONS
Senior Vice President, General Counsel


UNITED STATES
POSTAL SERVICE

September 29, 2006

Mr. Colm F. Connolly
United States Attorney
District of Delaware
The Nemours Building
1007 Orange Street, Suite 700
PO Box 2046
Wilmington, DE 19899-2046

Re: Lucille Green v. USPS
    Civil Case No. 04-1297

Dear Mr. Connolly:

We are in receipt of the court's Opinion regarding the above referenced matter. While we are pleased with the outcome of the case, we are dismayed by the court's assertions that the Postal Service has a "lamentable reputation." Contrary to the court's assertions, the Postal Service serves as a model of industry, civility and integrity.

The Postal Service is an organization of over 700,000 employees, which deliver 212 billion pieces of mail to over 144 million homes in the United States and its territories. Our employees serve over 7.5 million customers daily at more than 37,000 post offices. Over the past five years, the Postal Service has reduced its complement by 100,000 employees and taken $5 billion out of its costs, while at the same time maintained record levels of service each year. We have also streamlined our operations and introduced new equipment and internet services to make it much easier and more convenient for our customers to access our products and services.

In addition to providing quality service to the citizens of the United States, Postal Service employees frequently go above and beyond their regular duties. In 2005, 400 Postal Service employees were recognized as heroes – by risking their own lives to save the lives of the customers they serve. For instance, Dayton, Texas letter carrier, Louis Espinosa, braved smoke and fire to rescue a customer trapped inside a burning apartment. Espinosa arrived at the apartment house of the

475 L'ENFANT PLAZA SW
WASHINGTON DC 20260-1100
202-268-3500
FAX 202-268-4181
E-MAIL mgibbons@email.usps.gov
www.usps.com

A-11

- 2 -

customer and noticed smoke billowing out the front door. He immediately notified the fire department, dropped to his knees and crawled back through the apartment to the man's bedroom where he found him passed out – his clothing on fire. He put out the fire and dragged the customer to safety. Rescue personnel credit him for saving the customer's life as well as the apartment house. The 400 employees who were recognized were a small fraction of our letter carriers and other employees who routinely go above and beyond the call of duty in this manner throughout the country every day.

Heroic efforts by Postal Service employees are not limited to individual acts of bravery. Postal Service employees pledged nearly $39 million in 2005 to their favorite charities through the Combined Federal Campaign. Also in 2005, a record 71.3 million pounds of food was collected nationwide by our letter carriers, in the nation's largest food drive. And our employees regularly volunteer their own time to charitable organizations throughout the country.

When the country desperately needed heroes after the ravages of Hurricane Katrina, the Postal Service heeded the call. We spent tremendous time, money and resources to unite displaced customers with their mail. Even though most of our employees were similarly displaced, and our facilities damaged, we quickly provided a link to "normalcy" for those in desperate need.

The Postal Service is an organization made up of individuals who truly care about providing quality customer service and contribute their personal time and energies to their communities. We take great pride in the service we provide, and the positive impact we have on our customers' lives. Needless to say, we take great exception whenever our reputation is unfairly besmirched.

Please take whatever steps available to have the disparaging remarks stricken from the court's Opinion.

Sincerely,

Mary Anne Gibbons

A-12

1

```
 1              IN THE UNITED STATES DISTRICT COURT
              IN AND FOR THE DISTRICT OF DELAWARE
 2
                           - - -
 3
    LUCILLE GREENE,                 :    CIVIL ACTION
 4                                  :
              Plaintiff             :
 5                                  :
         vs.                        :
 6                                  :
    UNITED STATES POSTAL SERVICE,   :
 7                                  :
              Defendant             :    NO. 04-1297 (SLR)
 8
                           - - -
 9
                                    Wilmington, Delaware
10                                  Thursday, October 27, 2005
                                    4:26 o'clock, p.m.
11
                           - - -
12
    BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge
13
                           - - -
14
    APPEARANCES:
15
              GRADY & HAMPTON
16            BY:  JOHN S. GRADY, ESQ.
                   (Dover, Delaware)
17
                   Counsel for Plaintiff
18

19            PATRICIA C. HANNIGAN, ESQ. and
              SETH BEAUSANG, ESQ.,
20            Assistant United States Attorneys

21                 Counsel for Defendant

22                         - - -

23

24                                  Valerie J. Gunning
                                    Official Court Reporter
25
```

A-13

1  reach a consentual resolution, then I am prepared to accept
2  the evidence, and after the evidence, if I feel the need for
3  some post-trial briefing, either on legal issues or on the
4  facts that were presented, we will do that.
5           MR. GRADY: Just sort of in rebuttal, the comment
6  was, you know, how come we're here and counsel suggests that
7  someone contacted my client shortly afterwards. There was
8  contact. There certainly wasn't anything that went beyond
9  that. They certainly didn't make any suggestions, without
10 going into all the details.
11          THE COURT: All right. Well, it's a shame. As a
12 member of the Federal Government, I hate to see instances
13 where conduct by federal employees leads to cases like this.
14 It's a shame. It's shameful. Nevertheless, I have to stick
15 with the law and not sit in a court of equity necessarily.
16          So I will accept the evidence and we will go
17 forward.
18          Unless you have problems, we'll start on Monday,
19 November 7th, at 9:30. And because you don't think you'll
20 need all three days, I won't assign hours like I always do
21 with my other trials, but if I see that you're having
22 difficulty getting in evidence sufficiently, I might do
23 that.
24          MR. GRADY: Your Honor, I think surely we'll
25 finish in one day.

A-14